**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| EVANSTON INSURANCE COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-13-3157 |
| | § | |
| LAPOLLA INDUSTRIES, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

**I.     Introduction**

Lapolla Industries, a citizen of Texas and Delaware, manufactures spray polyurethane foam ("SPF") insulation.  Evanston Insurance Company, a citizen of Illinois, issued Lapolla three insurance policies, two commercial general liability ("CGL") policies and one excess liability policy.  The policies required Evanston to defend Lapolla against underlying suits seeking damages for bodily injury or property damage caused by Lapolla's products.  The policies also obligated Evanston to indemnify Lapolla for these damages.  The policies excluded coverage for damages for bodily injury or property damage that "would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time." (Docket Entry No. 23, Ex. B).  The policies defined "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, electromagnetic fields and waste."  (*Id.*).

This lawsuit stems from underlying litigation arising from Lapolla insulation installed during a home renovation.  In April 2010, during a covered period, the plaintiffs' renovation contractors

installed Lapolla-manufactured SPF insulation in the part of a home owned by Michael and Kimberly Commaroto that was being renovated.  The Commarotos and their house guest, Gretchen Schlegel, were not living in the part of the home undergoing renovations.  They complained that shortly after the insulation was installed in a renovated room, they smelled odors and suffered respiratory distress, causing them to leave the home.  Attempts to return triggered the same respiratory distress symptoms.  The plaintiffs moved out permanently, leaving their personal property.

In April 2012, the plaintiffs sued the general contractor and various subcontractors for negligence and breach of contract.  *Michael A. Commaroto, Kimberly S. Commaroto and Gretchen Schlegel v. Pasquale Guzzo, AKA Pasqualino Guzzo d/b/a PDB Home Improvement, Perfect Wall, LLC and Jozsef Finta*, No. FST-CV12-6013645S, Judicial Dist. Stamford, Ct.; *see also* (Docket Entry No. 27).  In July 2012, the contractors filed an apportionment complaint and a third-party complaint against Lapolla.  In the plaintiffs' second amended complaint, filed in April 2013, they also asserted a products-liability claim against Lapolla, alleging that it manufactured, sold, and marketed its SPF insulation in a defective and unreasonably dangerous manner.  (Docket Entry No. 27, at 36, ¶¶ 151-62).[1]

In 2013, Evanston filed this diversity-jurisdiction suit in Texas federal court.  Evanston sought a declaratory judgment that it has no duty to defend or indemnify Lapolla because of the policies' pollution exclusions.  (Docket Entry No. 1).  After Evanston amended its complaint,

---

[1]  The parties agree that the second amended complaint governs Evanston's duty to defend Lapolla against the plaintiffs' claims in the underling litigation.  *See AIX Specialty Ins. Co. v. Universal Cas. Co.*, 2012 WL 6862489, at *5 (S.D. Tex. Dec. 27, 2012) ("Where more than one pleading exists in the underlying suit, "the duty to defend is determined by examining the latest, and only the latest, amended pleadings." (quoting *Rhodes v. Chicago Ins. Co., a Div. of Interstate Nat. Corp.*, 719 F.2d 116, 119 (5th Cir. 1983)).

Lapolla answered and counterclaimed for a declaratory judgment that Evanston was obligated to defend and indemnify. (Docket Entry No. 22). In April and May 2014, Evanston and Lapolla cross-moved for summary judgment. (Docket Entry Nos. 23, 30). Both parties responded. (Docket Entry Nos. 30, 31, 33). Evanston also moved to strike certain of Lapolla's summary judgment exhibits, (Docket Entry No. 32), and Lapolla moved for leave to supplement the summary judgment record with versions of those exhibits addressing some of the deficiencies identified in Evanston's motions. (Docket Entry No. 33). Evanston opposed the motion to supplement. (Docket Entry No. 34).

Based on the motions, the briefs, the pleadings, the record, and the applicable law, the court grants Evanston's motion for summary judgment that it has no duty to defend, (Docket Entry No. 23), and denies Lapolla's motion, (Docket Entry No. 30). Evanston's motion to strike Lapolla's exhibits and Lapolla's cross-motion to supplement, (Docket Entry Nos. 32, 33), are denied as moot, although, as explained below, allowing the supplementation sought would not change the outcome. The parties are directed to file a statement by March 5, 2015, advising what issues remain to be decided and proposing a scheduling and docket control order for doing so.

The reasons for these rulings are explained below.

## II.    The Applicable Legal Standards

### A.    Summary Judgment

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine [dispute] of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). If the burden of

proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  Although the party moving for summary judgment must demonstrate the absence of a genuine dispute as to any material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  A dispute "is material if its resolution could affect the outcome of the action.'" *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (quoting *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003)).  "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response." *Quorum Health Res., L.L.C. v. Maverick Cnty. Hosp. Dist.*, 308 F.3d 451, 471 (5th Cir. 2002) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  "[T]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted).  "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by 'only a "scintilla" of evidence.'" *Little*, 37 F.3d at 1075 (citations omitted).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears a heavier burden when seeking summary judgment on a claim or defense on which it would bear the burden of proof at trial. *Fontenot v. Upjohn Co.*, 780 F.2d 1190,

1194 (5th Cir. 1986).  In that case, it "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant [summary] judgment in [its] favor." *Id.* (emphasis in original); *see also Meecorp Capital Mkts. LLC v. Tex-Wave Indus. LP*, 265 F. App'x 155, 157 (5th Cir. 2008) (per curiam) (quoting *Fontenot*). "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Meecorp Capital Mkts.*, 265 F. App'x at 158 (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).  When the parties cross-move for summary judgment, the court must review "each motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 110 (5th Cir. 2010) (internal quotation marks and alteration omitted).

## B.    Insurance Policy Interpretation and the Duty to Defend

The parties agree that Texas law governs.  Under Texas law, insurance policies are interpreted under the rules of construction that apply to contracts generally. *Sharp v. State Farm Fire & Cas. Ins. Co.*, 115 F.3d 1258, 1260 (5th Cir. 1997) (citing *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995)).  In interpreting a policy, a court must read all parts together, giving meaning to each sentence, clause, and word, to avoid making any portion inoperative. *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 748 (Tex. 2006).  The parties' intent "is governed by what they said, not by what they *intended* to say but did not." *Id.* at 746.  The terms used in an insurance contract are given their commonly understood or generally accepted meaning unless otherwise defined in the policy. *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 8 (Tex. 2007).

Ambiguities in insurance contracts are to be strictly construed against the insurer, *Sharp*, 115 F.3d at 1260-61; *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984), but only if the court first finds that the contract is ambiguous. *Sharp*, 115 F.3d at 1261. A policy provision is ambiguous if it is susceptible to more than one reasonable interpretation. *Id.*; *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). A court determines ambiguity by looking at the contract as a whole, in light of the circumstances present when the parties entered the contract. *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex. 2003). Whether the contract is ambiguous is a question of law for the court to decide. *Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520 (citing *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983)). An ambiguity does not arise simply because the parties offer opposing interpretations. *Fiess*, 202 S.W.3d at 746. The fact that the parties disagree as to coverage does not create an ambiguity, and extrinsic evidence may not be admitted for the purpose of creating an ambiguity. *Id*. As in all contracts, the court looks first to the language of the contract itself, and "[w]hen there is no ambiguity, it is the court's duty to give the words used their plain meaning." *Sharp*, 115 F.3d at 1261 (citing *Puckett*, 678 S.W.2d at 938).

The insured initially has the burden to plead and prove that the insurance policy at issue covers the benefits sought. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. Puget Plastics Corp.*, 532 F.3d 398, 401 (5th Cir. 2008). The insurer bears the burden of showing that a policy exclusion applies. *See id.* at 404. If the insurer meets this burden, then the insured must show that the claim does not fall within the exclusion or that it comes within an exception to the exclusion. *See Century Surety Co. v. Hardscape Constr. Specialties, Inc.*, 578 F.3d 262, 265 (5th Cir. 2009).

6

Whether an insurer has a duty to defend is distinct from whether the insurer has a duty to indemnify. *D.R. Horton-Tex., Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 743 (Tex. 2009).  To determine whether an insurer has a duty to defend, Texas courts apply the "eight-corners rule."  That rule "provides that when an insured is sued by a third party, the liability insurer is to determine its duty to defend solely from [the] terms of the policy and the pleadings of the third-party claimant." *GuideOne Elite Ins. Co. v. Fielder Road Baptist Church*, 197 S.W.3d 305, 307 (Tex. 2006).  This approach requires that the court compare only the "four corners" of the pleading with the "four corners" of the policy. *Allstate Ins. Co. v. Disability Servs. of the Sw. Inc.*, 400 F.3d 260, 263 (5th Cir. 2005) (applying Texas law).  "Resort to evidence outside the four corners of these two documents is generally prohibited." *Id.*  When the "eight-corners" rule applies, the court does not examine the merits of the underlying dispute or evidence extrinsic to the policy and the pleadings. Whether the insurer must defend is determined as a matter of law because the court need only examine the policy language and the allegations in the underlying lawsuit's pleading to make the decision. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997) (per curiam).  The court construes the policy language and then examines the factual allegations in the underlying suit to determine whether those allegations state a claim covered by the insured's policy. *See id.*  An insurer has no legal obligation to defend a suit if the underlying petition does not allege facts within the scope of coverage. *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex. 2002).  Doubts are resolved in favor of the duty to defend. *Id.*

Texas courts have long held that because the duty to defend is broader than the duty to indemnify, if there was no duty to defend, there was no duty to indemnify.  But the Texas Supreme Court recently clarified that the duty to indemnify is independent from the duty to defend.  In some

cases, an insurer may have a duty to indemnify even if a duty to defend does not arise.  *D.R. Horton-Tex.*, 300 S.W.3d at 744.  "While analysis of the duty to defend has been strictly circumscribed by the eight-corners doctrine, it is well settled that the 'facts actually established in the underlying suit control the duty to indemnify.'"  *Id.* (quoting *Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.*, 279 S.W.3d 650, 656 (Tex. 2009)).  The "duty to indemnify depends on the facts proven and whether the damages caused by the actions or omissions proven are covered by the terms of the policy."  *Id.* at 744.  Typically, a court considering a coverage dispute will consider additional evidence if needed to establish whether there was coverage in the underlying case, particularly if that case is resolved without a trial on the merits.  *Id.*; *see also Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. Puget Plastics Corp.*, 532 F.3d 398, 404 (5th Cir. 2008) (holding that the trial court can consider evidence of the facts required to determine coverage that were not adjudicated in the underlying litigation).  The trial court is authorized to make factual findings necessary to resolve coverage to determine the duty to indemnify.  *See Puget Plastics Corp.*, 532 F.3d at 404.

Although Evanston has moved for summary judgment as to both duties, Lapolla argues that only the duty to defend is ripe for decision, and Evanston does not argue otherwise.  (Docket Entry No. 30, at 7).  The summary judgment analysis is limited to the duty to defend.

## III.    The Duty to Defend

### A.    The Policies and the Total Pollution Exclusion

Evanston issued Lapolla three policies.  The first, a CGL policy, was effective from November 11, 2009 to November 11, 2010 and  covered up to $1 million per occurrence and had a $2 million general aggregate limit.  (Docket Entry No. 24).  A second CGL policy had the same policy limits and was effective from November 11, 2010 to November 11, 2011.  (Docket Entry No.

21, Ex. B).  The third policy, for excess liability, was effective from November 11, 2009 to

November 11, 2010 and carried a $4 million per occurrence limit and a $4 million aggregate limit.

(*Id.*, Ex. C).  The policies obligated Evanston to "pay those sums that [Lapolla] becomes legally

obligated to pay as damages because of 'bodily injury' or 'Property Damage' to which this Insurance

applies."  (Docket Entry No. 24; *see also* Docket Entry No. 21, Exs. B & C).[2]  The policies give

Evanston "the right and duty to defend any 'suit' seeking those damages."  (*Id.*).

Each of the policies has a total pollution exclusion that excludes coverage for:

> f.  Pollution
>
> (1) "Bodily Injury" or "property damage" which would not have
> occurred in whole or part but for the actual, alleged or threatened
> discharge, dispersal, seepage, migration, release or escape of
> pollutants at any time.
>
> . . . .
>
> Pollutants mean any solid, liquid, gaseous or thermal irritant or
> contaminant, including smoke, vapor, soot, fumes, acids, alkalis,
> chemicals, electromagnetic fields and waste.  Waste includes
> materials to be recycled, reconditioned or reclaimed.

(Docket Entry No. 24; *see also* Docket Entry No. 21, Exs. B & C).[3]

"Texas courts have consistently held similar pollution exclusions to be unambiguous."

*Noble Energy, Inc. v. Bituminous Cas. Co.*, 529 F.3d 642, 646 (5th Cir. 2008) (considering exclusion

for "Bodily injury or property damage arising out of the actual, alleged or threatened discharge,

---

[2]  The relevant coverage language from the two CGL policies is virtually identical and differs only in minor punctuation.  (*See* Docket Entry Nos. 21, Ex. B; 24).  The excess liability policy incorporates the first CGL policy's exclusions.  (Docket Entry No. 21, Ex. C).

[3]  The relevant pollution exclusion language from the two CGL policies is virtually identical, again differing only in minor punctuation.  One uses quotation marks for "pollutants" and the other does not.  (*See* Docket Entry Nos. 21, Ex. B; 24).  The excess liability policy incorporates the first CGL policy's exclusions. (Docket Entry No. 21, Ex. C).

dispersal, release or escape of pollutants" where pollutants were defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste"); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus.*, 907 S.W.2d 517, 521 (Tex. 1995) (holding that the total pollution exclusion was neither patently nor latently ambiguous); *Zaiontz v. Trinity Universal Ins. Co.*, 87 S.W.3d 565, 571 (Tex.App.-San Antonio 2002, pet. denied) (holding that a similar pollution exclusion was not latently ambiguous).

The key is whether the plaintiffs' operative pleading allegations fall within the pollution exclusion's plain terms—that is, whether the allegations about what "caused the [plaintiffs'] injuries arose out of [the actual, alleged, or threatened] 'discharge, dispersal, release or escape of pollutants.'" *Noble*, 529 F.3d at 646.

### B.     The Factual Allegations in the Underlying Lawsuit

The parties dispute which parts of the underlying second amended complaint are relevant for evaluating the duty to defend.  Evanston argues that the court must limit its analysis to those allegations in the "Summary of Facts" portion of the underlying complaint.  (Docket Entry No. 31, at 5-9).  Lapolla contends that the court should consider all the factual allegations, including the paragraphs expressly incorporated into the products-liability cause of action the plaintiffs asserted and the relevant factual allegations in the "Summary of Facts" section.  (Docket Entry No. 30, at 10).

Although legal assertions and theories may be ignored, factual allegations, whether they are pleaded as part of the general "factual background" or in a count asserting a specific cause of action, are properly considered in evaluating the duty to defend to the extent they bear on a policy exclusion.  *See Ewing Const. Co., Inc. v. Amerisure Ins. Co.*, 420 S.W.3d 30, 33 (Tex. 2014) ("In reviewing the pleadings and making the foregoing determinations, courts look to the factual

10

allegations showing the origin of the damages claimed, not to the legal theories or conclusions alleged.").   The fact that a complaint count asserting a specific cause of action expressly incorporates only some factual allegations does not make other factual allegations irrelevant or inapplicable.  Factual allegations not expressly incorporated in a count asserting a specific cause of action, including factual allegations in a general background section or in sections asserting other causes of action, may bear on the "origin of the damages claimed" in the cause of action under consideration.  If so, the court must consider those factual allegations in analyzing whether a policy exclusion applies to preclude the duty to defend.  *See Ewing*, 420 S.W.3d at 33.

The following factual allegations from the plaintiffs' operative pleading appear in the second amended complaint's factual background section and in the products-liability count against Lapolla. These allegations are relevant to determining whether the pollution exclusion applies.

> 6.  In 2001, Michael and Kimberly Commaroto ("the Commarotos") purchased a home located at 15 Deer Park Meadow Road in Greenwich, Connecticut.  The purchase prices was $3,535,000.00.

> 7.  By June 2009, the Commarotos decided to build an addition onto their home. . . .

> 8.  To accomplish this purpose, the Commarotos hired Guzzo to serve as their general building contractor ("General Contractor"). On or about June 8, 2009, the Commarotos and Guzzo entered into a contract ("the Contract") for Guzzo to serve as the General Contractor. . . .

> . . . .

> 12.  One of the tasks Guzzo was hired to perform with respect to the Commaroto home addition construction project was to install insulation in the renovated kitchen and butler's pantry as well as the new addition.

> . . . .

11

15.  Guzzo gave Mr. Commaroto the option of selecting either open cell or closed cell SPF insulation manufactured by Lapolla Industries, Inc. ("Lapolla").  In response to Mr. Cornmaroto's questions about the differences between open and closed cell SPF insulation, Guzzo instructed Mr. Commaroto to call Finta so that Finta could explain the difference between open cell and closed cell SPF insulation to Mr. Commaroto.

. . . .

19.  Guzzo made the decision to use the SPF insulation manufactured by Lapolla.

. . . .

23.  On April 27, 2010, Finta arrived at the Commaroto home without prior notice by him or by Guzzo to the Commarotos.

24.  Without checking to see whether there was anyone present in the older part of the home that was not under construction, Perfect Wall and Finta under Guzzo's supervision began to mix and apply a SPF insulation product manufactured by Lapolla.

25.  In fact, Schlegel [Commaroto's guest] was in the room adjacent to where the spraying was occurring, and was exposed for hours to the newly applied SPF insulation.

26.  When Mrs. Commaroto returned home on the same morning of April 27, 2010, she questioned Guzzo about whether it was dangerous or inadvisable for her family to remain in the home, and in particular, in the room adjacent to where the SPF insulation spraying was occurring.

27.   Guzzo, Finta, and other workmen represented to Mrs. Commaroto that there was no danger, and nothing to be concerned about. They represented to her that the SPF insulation would dry in a few minutes' time and was safe. . . .

28.  In addition, Mrs. Commaroto observed that the workmen present in the area of the addition were wearing only tee shirts and jeans while the SPF insulation product was being applied.

. . . .

12

30.   Before beginning the application of the SPF insulation, the defendants failed to seal off completely areas in which vapors could be transported from the areas under renovation and construction to the existing areas of the house in which the Commarotos, their three minor children, and their houseguest, Schlegel, were living and sleeping during the construction process.

31.   In violation of industry standards and the manufacturer's instructions, defendants did not create a "negative air pressure" zone to prevent vapors from the SPF installation from infiltrating the existing part of the home. . . .

. . . .

33.   Prior to the commencement of the installation of the SPF insulation, the Commarotos were not given the material safety data sheets ("MSDS") or the Foam-Lok Spray Foam Insulation Product Data Sheet for the Lapolla SPF insulation product.  No "Danger" signs were ever posted in the work area, and no effort was made to restrict the access of the Commaroto family from the area under construction during the SPF installation process. . . .

34.   The defendants failed to provide any warnings or instructions whatsoever to plaintiffs regarding the SPF installation, nor were the plaintiffs informed that there was a "curing period" of at least 24-72 hours for the SPF insulation, and that they should avoid the area for, at a minimum, that period of time.

35.   Later in the day on which the installation of the SPF insulation began, and notwithstanding the defendants' representations to plaintiffs that it was safe to remain in the home for the duration of the installation process, the Commarotos decided to leave the house for the remainder of the installation, and checked themselves, their three minor children, and Schlegel into a hotel.  They took only what they thought was necessary for a stay of a few days, leaving all the rest of their possessions in their home.

36.   Justifiably relying on the defendants' representations to them that there was no danger in being in the home during the installation of the SPF insulation, the Commarotos—sometimes alone, sometimes accompanied by their three young children—returned to the house periodically over the next four days to check on the progress of the insulation installation.  In particular, Mr. Commaroto returned to the

house ever[y] night for a[t] least an hour to inspect the work performed by defendants during that day.

37.  The defendants completed the installation of the SPF insulation in the afternoon of May 1, 2010.  Approximately five hours later, the Commarotos, justifiably relying on the representations of the defendants that they could move back in, moved their family back into their home.

38.  In the days subsequent to their return to their home on May 1, 2010, the Commarotos noticed a strong odor. Mrs. Commaroto repeatedly complained to Guzzo about the smell. In addition, plaintiffs began to experience symptoms of respiratory distress.

39.  On May 7, 2010 Mr. and Mrs. Commaroto met with Guzzo, Finta, the aforementioned Bruce (last name unknown), at which meeting Bruce stated that Finta had created a problem as a result of his improper installation of the SPF insulation. During the meeting, Finta made arrangements for Mr. Commaroto to receive the MSDS for the Lapolla SPF.  Upon receipt of these that same day and review of the warnings contained therein regarding proper application and the potential for respiratory distress if proper application procedures were not followed, Mr. Commaroto called Lapolla in great distress to describe the issues plaintiffs were having with the SPF insulation, including but not limited to the odor and health issues plaintiffs had experienced since the installation of the SPF insulation. . . .

. . . .

41.  On May 7, 2010, due to the continuing respiratory distress, the Commaroto family moved out of their home, leaving virtually all of their possessions, and moved into a rental house.  They have not lived in their home since.  Each time the Commarotos and Schlegel tried to enter the home or to use items taken from the home, they experienced the same type of marked respiratory distress. . . .

42.  On May 11, 2010, Mrs. Commaroto, Finta, Guzzo and a representative from Lapolla met to discuss the SPF insulation, the installation process that had been used, and its effect, actual or potential, upon the health of the Commaroto family.

43.  At the May 11, 2010 meeting, the Lapolla representative informed the Commarotos that defendants had committed serious errors in the SPF insulation installation process. . . .

14

45. Because of the actions and omissions of the defendants, plaintiffs have suffered and will continue to suffer substantial and disruptive bodily injury including but not limited to upper respiratory injury.

46. Plaintiffs have suffered and will continue to suffer bodily injury from exposure to their residence itself and from exposure to the personal property that was present in their residence at the time that the SPF insulation was negligently installed.

47. Because of the actions and omissions of the defendants, the Commarotos have suffered and will continue to suffer property damage including, but not limited to, the loss of their home – the new addition, the area being renovated, and the prior existing structure.

. . . .

## COUNT SEVENTEEN: PRODUCTS LIABILITY CLAIM (AGAINST LAPOLLA)

153. Lapolla manufactured, sold, and/or distributed the product at issue in the present matter.

157. As a result of the product being installed in the plaintiffs' home, the plaintiffs have suffered and will continue to suffer bodily injury in that their health has been seriously and permanently impaired.

158. As a result of the product being installed in the plaintiffs' home, the plaintiffs have suffered and will continue to suffer substantial and disruptive bodily injury including but not limited to upper respiratory injury.

159. Plaintiffs have suffered and will continue to suffer bodily injury from exposure to their residence itself and from exposure to the personal property that was present in their residence at the time the product was installed.

160. As a result of the presence of the product in their home, the plaintiffs have suffered and will continue to suffer property damage including, but not limited to, the loss of their home—the new addition, the area being renovated, and the prior existing structure.

161. As a result of the presence of the product in their home, the plaintiffs have suffered and will continue to suffer property damage including, but not limited to, the loss of all their possessions that were

present in the home at the time of the product installation.  These possessions include, *inter alia*, clothes, furniture, antiques, window treatments, mattresses, rugs, electronics, computers, appliances, musical instruments, fine art, books, and exercise equipment.

162.  As a result of the presence of the product in their home, the plaintiffs have incurred and will continue to incur substantial out-of-pocket costs for alternative living, food, property, clothes, medical expenses, and costs to investigate and remediate the damages caused by the use of the product in the home.

(Docket Entry No. 27, Ex. D).

### C.    Whether the Total Pollution Exclusion Precludes Coverage

Evanston argues that the total pollution exclusion relieves it of the duty to defend because the underlying complaint alleged and necessarily required that the plaintiffs' exposure and bodily injury and personal-property damages stemmed from the release and migration of harmful vapors from the Lapolla-produced insulation installed in the part of the house being renovated.  (Docket Entry No. 23).  Lapolla responds that the exclusion applies only to pollutants that have "somehow moved from [their] intended state or location" and that the mere "presence" of the allegedly defective SPF insulation in the plaintiffs' home (rather than the release and migration of vapors to the part of the home the plaintiffs were inhabiting) also caused them bodily injury and damaged their home and its contents.  (Docket Entry No. 30).

The plaintiffs' operative pleading alleges that vapors from the SPF insulation caused their bodily injuries and property damage.  According to the second amended complaint, the defendants "failed to seal off completely areas in which vapors could be transported from the areas under renovation and construction to the existing area[] of the house[,] in which the Commarotos, their three minor children, and their houseguest, Schlegel, were living and sleeping during the construction process."  (Docket Entry No. 24, ¶ 30).  As a result, the plaintiffs allegedly suffered

adverse health effects, incurred costs in investigating and remediating the situation, and suffered property losses in the form of personal belongings affected by the vapor and their inability to use their newly renovated home. (*See id.*, ¶¶ 31 (describing the failure to contain "vapors" from the SPF insulation), 38 (alleging a "strong odor" and "symptoms of respiratory distress"), 41 ("respiratory distress"), 45 ("upper respiratory injury"), 46 ("exposure to" the residence and property within it "at the time" of the SPF installation), 48 (loss of possessions "that were present in the home at the time of the installation of the SPF insulation"), 49 (costs incurred for "alternative living, food, property, clothes, [and] medical expenses" and "to investigate and remediate the damage causes"), 158 ("upper respiratory injury"), 159 ("exposure to their residence itself and from exposure to the personal property that was present . . . at the time the product was installed"), 162 ("costs to investigate and remediate the damages caused by the use of the product in the home").

Lapolla points to the plaintiffs' allegations about the "presence of the product in their home" and argues that these allegations do not trigger the pollution exclusion. Lapolla contends that the second amended complaint "makes a clear distinction between alleged injuries and damages resulting from SPF installed in their home versus those allegedly caused by 'vapors' allegedly released from the SPF after it was installed." (Docket Entry No. 30, at 16). The distinction is between the harm caused by the mere presence of the SPF in the part of the home undergoing renovations, as opposed to the harm caused by the release of vapors to the parts of the home where the plaintiffs were living, including the guest room adjacent to the room in the renovation area where the insulation was sprayed.

Lapolla distinguishes between damage from exposure to vapors resulting from the installation process used by the defendants," and one plaintiff's "expos[ure] for hours to the newly-

applied SPF insulation." (*Id.* (quoting (Docket Entry No. 27, ¶¶ 25, 106)). The second allegation, Lapolla contends, suggests harm from physical contact or the mere presence of the SPF in the part of the home undergoing renovation, rather than harm from the release of vapors from that part of the home to the rest of the residence where the plaintiffs were living and their personal possessions were located. The allegations undermine this distinction. The allegations include that "[b]efore beginning the application of the SPF insulation, the defendants failed to seal off completely areas in which vapors could be transported from the areas under renovation and construction to the existing areas of the house in which the Commarotos, their three minor children, and their houseguest, Schlegel, were living and sleeping during the construction process." (*Id.* ¶ 30). The factual allegations about the Lapolla SPF insulation make clear that it was present only in the part of the house undergoing renovation, and that the bodily harm to the Commarotos and their guest, and the damage to their personal property, occurred when vapors migrated to the rooms where the Commarotos lived and their guest was staying.

The case law also undermines Lapolla's attempt to recharacterize the plaintiffs' damages as stemming from the presence of the insulation itself, rather than from the release and migration of its vapors. In *Hamm v. Allstate Insurance, Co.*, 286 F. Supp. 2d 790 (N.D. Tex. 2003), the court concluded that a similar pollution exclusion barred coverage for injuries from fumes from chemicals that escaped from the room where they were applied during an indoor remodeling project to the rooms where the injures occurred:

> Although Intervenors' petition couches their claim as seeking redress for injuries caused by an accumulation of pollutants and the failure to properly ventilate the office building, their injuries resulted in the first place from the fact that the toluene fumes moved from the bathroom to their office. Certainly, permitting the fumes to accumulate inside the building and failing to adequately ventilate the

18

> building might have exacerbated Intervenors' injuries. *It is clear from Intervenors' petition, however, that their injuries were caused by their exposure, while in their fifth-floor office, to fumes from chemicals applied in the fifth-floor bathroom during a remodeling project. The only way those fumes could have affected Intervenors in their office is if the fumes first were either discharged, dispersed, or released from the bathroom or escaped, seeped, or migrated from the bathroom into Intervenors' office.* Although Intervenors have attempted to artfully plead their claim so as to invoke coverage under the policies, because their injuries arose from the "discharge, dispersal, seepage, migration, release or escape" of a "pollutant," as that term is defined under the policies, "at . . . [the] premises," the Court concludes that the pollution exclusions bar coverage.

*Id.* at 794-95 (emphasis added); *see also Nautilus Ins. Co. v. Country Oaks Apts. Ltd.*, 566 F.3d 452, 457 (5th Cir. 2009) (finding that the pollution exclusion's "requisite movement clearly occurred because the carbon monoxide at issue accumulated only after being discharged from [the underlying plaintiff's] furnace," and citing *Hamm* for the proposition that "[t]he mere fact that the carbon monoxide accumulated in the contained space of an apartment, as opposed to the environment generally, does not change this analysis, as numerous courts applying Texas law have recognized").

Lapolla argues that *Clarendon Am. Ins. Co. v. Bay Inc.*, 10 F. Supp. 2d 736, 744-45 (S.D. Tex. 1998), which concluded that a similar pollution exclusion precluded some injuries but not those "caused by direct contact with wet cement," required Evanston to defend against the Commarotos' allegations about the "the use of the product" and its "presence" in their home. But in *Clarendon*, the petition alleged that the plaintiffs "often expose[d] different portions of their bodies to the wet cement" and "contact[ed] wet cement." 10 F. Supp. 2d at 744 (quoting state-court petition). As a result, the court was "unable to ascertain definitively from the[] pleadings whether the bodily injury caused by such contact or exposure occurred when the plaintiffs' skin touched the wet cement and concrete while the cement and its ingredients were in the cement's intended container or location,

19

in which case resulting injuries did not stem from the 'discharge, dispersal, seepage, migration, release or escape of pollutants.'" *Clarendon*, 10 F. Supp. 2d at 744.  Here, by contrast, the second amended complaint neither alleges nor implies that the Commarotos or their house guest touched the SPF insulation or that their damages stemmed from "direct contact" with it.  On the contrary, their general allegations about the "presence" of the insulation include allegations that the harm resulted from the dispersal and migration of toxic emissions from the place of installation—the portions of the home being renovated—to the existing parts of the home, where the Commarotos lived and their house guest was staying.

Lapolla points to evidence of facts that are not alleged in the second amended complaint that one of the Commarotos did in fact touch the SPF insulation.  Lapolla has submitted the Commarotos' deposition testimony and a medical report as exhibits in support.  (Docket Entry Nos. 30, Exs. 1 & 2; 33, Exs. 1, 2 & 3).  Evanston has moved to strike the exhibit with deposition testimony on the basis that the deposition was taken in the underlying case and Evanston had no opportunity to cross-examine.  *See* Fed. R. Evid. 804(b)(1); (Docket Entry No. 32).  Evanston has moved to strike the medical report as unauthenticated hearsay and unqualified expert testimony submitted in violation of Fed. R. Evid. 702.  (*Id.*).  Lapolla responds that the deposition testimony and medical report are not hearsay because they are not offered for the truth of the matter asserted, but to show that direct exposure through touching the insulation could be an issue in the underlying case.  (Docket Entry No. 33); *see also* Fed. R. Evid. 801; *Nautilus Ins. Co. v. County Oaks Apts.*, 566 F.3d 452, 452 (5th Cir. 2009) ("The duty to defend does not depend upon the truth or falsity of the allegations.").

"In performing its eight-corners review" to determine the duty to defend, "a court may not read facts into the pleadings, look outside the pleadings, or speculate as to factual scenarios that might trigger coverage or create an ambiguity." *Gilbane Bldg. Co. v. Admiral Ins. Co.*, 664 F.3d 589, 596 (5th Cir. 2011). "Only a few Texas appellate courts have held that the examination of extrinsic evidence was warranted under an exception to the eight-corners rule." *ACE Am. Ins. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832, 840 (5th Cir. 2012) (citing cases). "The exception to this rule is limited to cases where 'it is initially impossible to discern whether coverage is potentially implicated *and* when the extrinsic evidence goes solely to a fundamental issue of coverage which does not overlap with the merits of or engage the truth or falsity of any facts alleged in the underlying case.'" *Id.* at 840 (quoting *Ooida Risk Retention Group, Inc. v. Williams*, 579 F.3d 469, 475 (5th Cir. 2009)) (emphasis original). "[E]xtrinsic evidence is more likely to be considered when an 'explicit policy coverage exclusion clause[ ]' is at issue" because that is less likely to implicate the merits, but it must first be "initially impossible to discern whether coverage is potentially implicated." *Star-Tex Res., LLC v. Granite State Ins. Co.*, 553 F. App'x 366, 371-72 (5th Cir. 2014) (citing *Liberty Mut. Ins. Co. v. Graham*, 473 F.3d 596, 603 (5th Cir. 2006)).

In *Star-Tex*, the panel concluded that it was "initially impossible to discern whether coverage is potentially implicated" because "[t]he complaint contain[ed] only one, brief sentence describing the facts of the accident" and "contain[ed] no description of *how*" the insured caused the collision. *Id.* at 372. No such initial impossibility exists in this case. The plaintiffs' complaints, including the second amended complaint, allege in detail facts giving rise to the plaintiffs' alleged bodily injuries and property damage. The more general allegations that the plaintiffs suffered damage as a result of the "presence" of the product in the home and "exposure" stem from and necessarily depend on

the specific allegations.  None of the factual allegations state or suggest that any of the plaintiffs directly touched the insulation for an extended period or for any period at all.  To the contrary, all the factual allegations emphasize that the harm resulted from the vapors and odors from the areas of renovation to the existing part of the house and the resulting respiratory distress to those living there.

Because the extrinsic-evidence exception to the eight-corners rule does not apply, the court may not consider Lapolla's summary judgment exhibits about factual circumstances that might otherwise support coverage under the policy.  The motions to supplement, or to strike, the deposition testimony and the medical report are either moot, because the court considered the testimony and found it irrelevant to the duty to defend under the eight-corners rule, or granted, because the eight-corners rule applies.  (Docket Entry Nos. 32, 33).

Lapolla also cites *Doe Run Resources Corp. v. Lexington Ins. Co.*, 719 F.3d 876 (8th Cir. 2013), which held that the insurer had a duty to defend against allegations in an underlying suit that the defendant "caused bodily injury and property damage when it left the Leadwood Pile 'open and available for use by the general public' until October 2009 without posting 'warning signs addressing the dangers of exposure to lead.'" *Id.* at 883.  But the *Doe Run* case concerned two underlying lawsuits, one "seeking damages for Doe Run's tortious operation of the Leadwood Pile" (the *McSpadden* Lawsuit) and the other "seeking damages for Doe Run's tortious release of lead and other toxic chemicals from the Leadwood Pile" (the *Briley* Lawsuit).  *Id.* at 879.  The panel concluded "that the pollution exclusions preclude[d] a duty to defend Doe Run in the *Briley* Lawsuit, but not in the *McSpadden* Lawsuit."  *Id.* at 879 (emphasis added).

22

This case is more akin to *Briley* than to *McSpadden*.  Unlike the second amended complaint's allegations in this case, the *McSpadden* plaintiffs' allegations were "*not* explicitly premised on an alleged release of hazardous wastes or toxic substances."  *Id.* at 883.  Instead, the "*McSpadden* complaint alleged bodily injury and property damage from two causes that did not necessarily entail a 'release' of hazardous wastes or toxic substances."  *Id.*  First, the *McSpadden* plaintiffs "alleged that Doe Run *distributed* chat and other toxic substances into the community for use 'as fill material and for use on roads, streets, alleyways, driveways, in the foundation of homes and/or other buildings, and for use in children's sandboxes.'"  *Id.* (quoting underlying complaint).  Although the plaintiffs here alleged that Lapolla "manufactured, sold, and/or distributed the product at issue in the present matter," (Docket Entry No. 27, ¶ 153), they did not allege that these actions caused harm other than that associated with the release and migration of vapors from the parts of the home being renovated to the parts where they were living.  Second, the *McFadden* plaintiffs alleged that they "were exposed" to "lead and other toxic substances" through the "public access *on and around* the Leadwood pile," where they engaged in "sledding, riding four-wheelers, riding dirt bikes, and general playing, *similar to playing in the sand on a beach*."  *Id.* at 882 (quoting underlying complaint) (emphasis added).  Here, instead of alleging that they "came to the" insulation, *id.* at 883, the Commarotos alleged that harmful vapors from the SPF came to them and to their house guest from the area undergoing renovations to the other parts of the house.

Lapolla also relies on *Union Pacific Resources Co. v. Aetna Casualty & Surety Co.*, 894 S.W.2d 401 (Tex. App.–Fort Worth 1994, pet. denied), which distinguished between the "deposit" and "subsequent escape of pollutants from" a disposal site in "determining coverage."  *Id.* at 404.  But the question in *Union Pacific* was whether disposal qualified as an "occurrence" under the

policy, not whether the allegations triggered the total pollution exclusion.  *See id.* at 404 (holding that it is "the consequence rather than the event itself which must be neither expected nor intended" in determining whether property damage is unexpected or unintended and therefore a covered "occurrence" under the policy).

Lapolla argues that the plaintiffs' property damage allegations do not fall within the pollution exclusion because the "structure of the Commarotos' new addition has [not] been damaged by vapors" and even if "the SPF may not pose a health risk if left undisturbed, like asbestos, it may still negatively affect the value of their home."  (Docket Entry No. 30, at 20-21).  These assertions, however, are not tethered to factual allegations in the plaintiffs' operative complaint.  The second amended complaint alleges that the plaintiffs suffered the "loss of their home" and "all their possessions that were present in the home at the time of the product installation," and incurred "costs for alternative living, food, property, clothes, medical expenses," as well as "to investigate and remediate the damages caused by the use of the product in the home."  (Docket Entry No. 27, ¶¶ 160-62).  The second amended complaint does not allege that the SPF insulation caused structural problems with the home or reduced its value.  Nor does the second amended complaint allege that the loss of their home and personal belongings stemmed from anything other than the vapors associated with the allegedly faulty SPF installation that traveled from within the walls of the renovation area of the house to the areas in which the plaintiffs were living and had their possessions.

Another court has rejected similar arguments Lapolla made in a case involving virtually identical exclusion language and similar underlying allegations.  In *Lapolla Industries, Inc. v. Aspen Specialty Ins. Co.*, 962 F. Supp. 2d 479 (E.D.N.Y. 2013), Lapolla sought a declaratory judgment that

24

under Texas law, Aspen, the insurer, was obligated to defend and indemnify Lapolla in connection

with an underlying personal-injury suit.  The complaint in the underlying suit had alleged "that

Lapolla's SPF is hazardous and defective because after application, the product emits an odor

associated with the 'off-gassing' of hazardous compounds and toxins."  *Id.* at 482.  The underlying

complaint also alleged that the plaintiffs' "structures, personal property, and bodies" were "exposed

to Defendant Lapolla's problematic SPF and the harmful effects of the gases it emits long after

installation."  *Id.* at 483 (quoting underlying complaint).  The underlying complaint sought

"compensatory and punitive damages as well as injunctive relief in the form of repair and

remediation of homes, rescission of contracts, and an order that corrective notices to be sent to

homeowners."  *Id.* at 483.

Aspen moved to dismiss under a virtually identical pollution exclusion.  *See id.* at 481.  The

district court granted the motion, stating as follows:

> The allegations of the *Markey* Lawsuit are centered on allegations of
> personal and property damages attributable to the "off-gassing" of
> Lapolla's SPF product.  That lawsuit refers to the nature of the gas
> expelled, describing it as a toxic irritant.  Plainly, these allegations
> refer to an alleged discharge of a "gaseous" "irritant," "vapor" or
> "fume," and thus fall squarely within the Policies' language of
> exclusion.  Also squarely within the language of exclusion are the
> Markeys' requests for relief, which include requests for ongoing
> monitoring and remediation.  As demonstrated above, Texas courts
> construing pollution exclusion clauses that are either identical, or
> strikingly similar to those presented here, have held such clauses to
> be clear and unambiguous in their application to exclude coverage.
> *National Union*, 907 S.W.2d at 518.  In such cases, extrinsic evidence
> of intent will not be considered.  *Id.* at 521–22.  Application of Texas
> law compels only one conclusion.  Coverage for the *Markey* Lawsuit
> is excluded from the Policies.

*Id.* at 490-91 (emphasis added).  The Second Circuit affirmed, concluding that "[u]nder Texas law,

the [Total Pollution Exclusion] Clause was unambiguous and excluded coverage of the underlying

claims, warranting dismissal of Lapolla's complaint for failure to state a claim on which relief can be granted." *Lapolla Indus., Inc. v. Aspen Specialty Ins. Co.*, 556 F. App'x 95, 97 (2d Cir. 2014).

These decisions, while not preclusive, are persuasive.  Like the *Markey* plaintiffs, the *Commaroto* plaintiffs alleged that they were "exposed" to Lapolla's SPF insulation because it emitted harmful vapors that caused respiratory distress.  Similar to the *Markey* plaintiffs, the *Commaroto* plaintiffs sought investigation and remediation costs.  (Docket Entry No. 27, at 39 ¶ 162, 43).  The underlying allegations in this case also trigger the pollution exclusion and relieve Evanston of the duty to defend.

## III.    Conclusion

Evanston's motion for summary judgment that it has no duty to defend, (Docket Entry No. 23), is granted.  Lapolla's motion for summary judgment that it is owed a duty to defend, (Docket Entry No. 30), is denied.  Evanston's motion to strike Lapolla's exhibits and Lapolla's motion to supplement its exhibits, (Docket Entry Nos. 32, 33), are denied as moot.  The parties are directed to file a statement by **March 5, 2015**, stating the issues that remain to be decided and proposing a scheduling and docket control order for doing so.

SIGNED on February 23, 2015, at Houston, Texas.

Lee H. Rosenthal
United States District Judge